## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **THE ARK GROUP,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **Civil Action No.** |
| ) | |
| **VASQUEZ HEALTHCARE, LLC,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

## PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND BRIEF IN SUPPORT THEREOF

Pursuant to Fed. R. Civ. Pro. 65 and Local Rule 7.2, Plaintiff The Ark Group ("Ark" or "Plaintiff") submits this Emergency Motion for Temporary Restraining Order and Preliminary Injunction and Brief in Support Thereof as follows:

## I.    INTRODUCTION

### A.    Nature of this Lawsuit

Ark brings this action to prevent Defendant Vasquez Healthcare, LLC ("Vasquez") from its improper misappropriation of Ark's confidential business information, intellectual property, and trade secrets in direct violation of Vasquez's contractual and legal obligations owed to Ark, and to seek redress for such violations. Ark additionally brings this action to prevent Vasquez from unilaterally,

24864439.2

and without contractual or legal basis, removing or interrupting Ark's ability to access and provide its clients and their members with access to Ark's services.

As set forth below, Ark hired Vasquez to provide a software platform, and to work with Ark to build out Vasquez's original basic platform to service Ark and Ark's client-organizations, as well as their members.[1] Ark hired Vasquez to assist in the buildout of the Modified Platform with the goal of automating the essential third party administrator ("TPA") services Ark provides to its client-organizations and members. The parties entered into a Services Agreement dated April 3, 2023 (the "Services Agreement" attached hereto as **Exhibit A**) to memorialize the design services Vasquez would perform to develop Ark's Modified Platform.

Ark provided Vasquez unique programming logic, operational process flows and plan design triggers to facilitate the proper software enhancements necessary to help automate Ark's TPA services for Ark's client-organizations and their members. Ark further provided Vasquez with highly sensitive and proprietary information concerning Ark's internal operations, vendors, and clients.

In recent months, Vasquez has "gone rogue" and is now exploiting Ark's proprietary information (and that of Ark's clients) as Vasquez's own. Vasquez is trying to improperly position itself as a quasi-competitor by attempting to make

---

[1] The software platform at issue (Defendant's original base platform, plus the modifications and improvements commissioned by Ark) is referred to as the "Modified Platform."

direct arrangements with Ark's clients and vendors (while using Ark's confidential and proprietary data, information, product and services), thus causing substantial marketplace confusion and damage to Ark's good will. Even worse, Vasquez has threatened to shut down Ark's access to the proprietary Modified Platform -- which would immediately halt service and access to Ark's thousands of customers and vendors, thus threatening Ark irreparable harm. Given that Vasquez was hired to build the Modified Platform for Ark, Vasquez's conduct is especially problematic.

**B.      Basis for Expedited Hearing under LR 7.2(D)**

Ark seeks immediate injunctive relief on two main fronts. First, to prevent Defendant from interrupting service to Ark's client-organizations and their members. Second, to enjoin Defendant's continued and improper exploitation of Ark's Confidential Information and Ark's Modified Platform.

More specifically, Ark seeks an injunction preventing Vasquez from: (1) shutting off Ark, its customer-organizations and their members, and Ark's vendors to the Modified Platform; (2) continuing to misappropriate and use Ark's confidential information and intellectual property; (3) utilizing the Modified Platform for purposes not authorized by Ark (including without limitation providing services directly to any Ark client-organization and their members); and (4) otherwise further breaching the Services Agreement and violating its legal obligations to Ark.

24864439.2

Maintaining the status quo is an urgent matter of public well-being. Among other things, Ark provides insurance services to over 256 client-organizations and, within those organizations, to over 28,000 members who need Ark's Modified Platform (hosted by Vasquez) to access vital healthcare information and schedule medical appointments. Ark relies on the Modified Platform to provide the TPA services called for in its agreements with its client-organizations. There is no lawful basis to interrupt service to Ark or Ark's end users, and doing so could have vast, serious consequences for individuals who suddenly find themselves without access to healthcare services. Injunctive relief is absolutely necessary to prevent this.

Moreover, Vasquez's ongoing misappropriation of Ark's trade secrets has caused, and will continue to cause, actual injury to Ark by, among other things, destroying Ark's ability to provide its proprietary automated TPA services to its client-organizations and their members, destroying Ark's exclusive ownership and use of the trade secret information, limiting and threatening to destroy Ark's access to its trade secret information, devaluing the trade secret, and causing a loss of competitive advantage in the marketplace, loss of business, confusion of customers, and loss of goodwill. Injunctive relief is needed to prevent further irreparable harm.

For these reasons, as set forth in greater detail below, Ark seeks the Court's expedited consideration of this Motion pursuant to L.R. 7.2(B) N.D. Ga. Given the

24864439.2

exigencies and the complexity of this matter, Ark also seeks minor relief (roughly two additional pages) from the twenty-five (25) page limit of LR 7.1D.

## II.    FACTUAL BACKGROUND

### A.    The Parties and the Services Agreement

Ark is a national insurance third party administrator based in Omaha, Nebraska. *See* Verified Complaint ("Compl.") at ¶ 5. Ark provides insurance and non-insurance TPA services to over 256 client-organizations and, within those organizations, to over 28,000 members. *Id.* at ¶ 6. Ark provides a span of TPA services to its client-organizations including the following:

1. Designing, managing and administering custom health plans for accidental/supplemental benefits for members;

2. Oversight of member claims and ensuring members have proper access to covered services provided by Ark's network of contract vendors;

3. Designing proper benefit structures and facilitating client-organizations with regulatory compliance; and

4. Acting as the central point for all accounting activities related to the plan benefits, client-organization funding for those benefits and payment of vendors providing covered services.

Ark also supports its client-organizations via brokerage services, licensing, and contracting, through commission administration. Ark also provides billing,

remittance, and reconciliation for its client-organizations. *Id*. at ¶ 7.  All of the services addressed herein comprise the make-up of the bundle of TPA services Ark provides for its client-organizations and their members.  Ark hired Vasquez to build-out the Modified Platform to automate a large portion of Ark's TPA services for Ark's client-organizations, their members, and the vendors providing services to the members.

Importantly, Ark also provides fulfillment for its client-organizations and to over 28,000 individuals, which includes creating and providing member portals for individuals to access insurance and non-insurance resources.  Ark also provides programs to support members' understanding of the benefits and services provided by the client-organizations. *Id*. at ¶ 8.

Ark has created a unique and proprietary product to serve its client-organizations. *Id*. at ¶ 9.  It has relationships and agreements with a conglomerate of vendors to create the book of services for its client-organizations. *Id*. at ¶ 10. As a result of Ark's relationship with these conglomerates of vendors and its unique internal structure, Ark can negotiate pricing structures and member services that others in the industry cannot. For example, Ark's relationship with certain telecare providers has allowed it to provide virtual primary care to its client-organizations (and their employee-members) at prices well-below market. By way of another example, Ark's relationship with certain laboratory services providers allows Ark

6

to provide its members with dedicated lab programs that provide lab services at fixed amounts. *Id.* at ¶ 11. The vendors providing the services under Ark's program have direct contractual relationships with Ark, not the client-organizations or their members. *Id.* at ¶ 12.

These services and the data associated with benefit plan structures and plan usage by the client-organization and their members, and the data associated the identify, pricing and history of services provided by Ark's contractual vendors, was all loaded into the Modified Platform and accessible to Vasquez for the express purpose of performing under the Services Agreement and no other purpose.

Vasquez is a technology company in the healthcare space that provides a basic software platform to administer data and information management and certain services. *Id.* at ¶ 13.

Pursuant to the Services Agreement, Vasquez was hired to build a custom software platform for Ark that would become the data processing engine to store and process a large volume of sensitive data for Ark's clients and their participating members. *Id.* at ¶ 15. Specifically, the aim was to provide "provide Client [Ark] the ability to manage their employees, marketers, referrals, groups, members, payments/billing, incentives, vendor payables, products/pricing, list invoices, media files, outgoing emails, text messages, online enrollment, customer service,

and support other-operational and administration processes." <u>See</u> Services Agreement, at Exhibit A thereto.

Vasquez's original software platform (the "<u>Original Platform</u>") could not perform the automated TPA services the Services Agreement called for. The Original Platform was in essence a repository to deposit data. *See* Compl. at ¶ 17. As Vasquez and Ark discussed, substantial enhancement, improvements, and modifications to the Original Platform would be necessary to meet Ark's specific needs. *Id*. at ¶ 18.

Ark worked with Vasquez to make these various enhancements, improvements, and other modifications (the "<u>Ark Modifications</u>") to Vasquez's Original Platform. *Id*. at ¶ 19. And, Ark provided Vasquez with multiple Ark employees who provided daily support in the development of the Ark Modifications from approximately February 2022 to April 1, 2025. *Id*. at ¶ 20.

While Vasquez's team provided the back coding support on the software program, Ark provided the detailed information to design, support and create the Ark Modifications. *Id*. at ¶ 21. Ark worked with Vasquez daily on the Ark Modifications, which efforts included guiding Vasquez on necessary modifications, providing Vasquez with feedback from vendors and client-organizations, and running simulations to test the Ark Modifications. *Id*. at ¶ 22. Ark built out the Original Platform to perform functions supporting commission

administration, billing, remittance, reconciliation, and its fulfillment of Ark's TPA services. Essentially, every aspect of the Original Platform was modified through specific work product and information provided by Ark to meet Ark's unique needs. *Id*. at ¶ 23. This is how the Modified Platform came to be.

Ark also loaded its confidential and proprietary client-organizations and their members' data into the Modified Platform so that Ark, with assistance from Vasquez, could process the data to fulfill Ark's business needs. *Id*. at ¶ 25. Ark also loaded its confidential and proprietary vendor data, including contractual arrangements, pricing structures, and negotiated services, into the Modified Platform so that Ark, with assistance from Vasquez, could process the data to fulfill Ark's business needs. *Id*. at ¶ 26. Ark's Confidential Information included electronic copies of signed agreements with its client-organizations. *Id.* at ¶ 71.

## B.    Key Provisions of Services Agreement Relevant to this Motion

All of the data maintained in the Modified Platform constitutes Ark's "Confidential Information" as defined under Section 3 of the Services Agreement. And, the Services Agreement gives top priority to protecting the parties' Confidential Information. Under Section 3(a), the Confidential Information of a party may be used by the other party "only in connection" with or "as permitted" by the Services Agreement. Likewise, under Section 3(c), the Confidential

9

Information Ark provided to Vasquez cannot be used by Vasquez for its own benefit without Ark's consent.

Section 3 further provides as follows: "The parties acknowledge that a breach of the terms, covenants or conditions contained in this Section 3 by either of them will cause irreparable damage to the other for which a remedy at law would not be adequate." *See* Services Agreement at Section 3(e).

All of the client and member data, vendor data, Confidential Information, and the Ark Modifications constitute Ark's "Client Work Product" as defined in Section 4.2(a) of the Services Agreement. The Modified Platform also constitutes Ark's Client Work Product and Ark's Intellectual Property Rights as defined in Section 4.2(a) of the Services Agreement.  Section 4.2(a) also gives Ark sole and exclusive ownership of its Client Work Product and Intellectual Property Rights.

The Services Agreement has a three (3) year term, which expires April 23, 2026.  <u>See</u> Services Agreement, at Section 11.1. Either party can terminate the Services Agreement in the event of a material breach of the other party, but only upon thirty (30) business days written notice of the breach and a failure to cure by the breaching party.  *See* Services Agreement, at Section 11.2.

**C.**     <u>**Vasquez Breaches the Agreement, Exploits Ark's Confidential Information, and Threatens Future Irreparable Harm**</u>

In February 2025, Ark hosted Vasquez's Founder and Chief Executive Officer (CEO), Mr. Mohapatra, as well as one of Ark's then-client-organizations,

24864439.2

Health Compass, Inc. ("Health Compass"), for a collaborative meeting. *See* Compl. at ¶ 34. Ark had been providing Ark's services to Health Compass under a Non-Disclosure Agreement ("NDA"), attached hereto as **Exhibit B.** The goal of this meeting was to work as a group to discuss technology developments in the healthcare space at Ark's direction. *Id*. at ¶ 36.

Ark wanted to hear from Health Compass directly on any issues Health Compass had, and Ark felt having Mr. Mohapatra there would be productive – he could hear directly from Ark's client on how the Modified Platform was working and whether improvements could be made. *Id*. at ¶ 37. At the time, Health Compass had approximately 3,000 members using Ark's services. Health Compass essentially distributed Ark's services to its (Health Compass's) members. *Id*. at 38.

Soon after the February 2025 meeting, Health Compass began secretly reaching out certain Ark vendors in an effort to cut out Ark's role in providing the services. *Id*. at 39. The vendors informed Ark of Health Compass's behavior and communicated to Health Compass that they would not work with Health Compass directly. *Id*. at 40. One such example is attached hereto as **Exhibit C**.

Health Compass had access to its particular Ark-provided platform and the members' information that had been provided by Health Compass. *See* Compl. at 41. Health Compass does not have the ability to build out the Ark product or services, and it has no capability in the Modified Platform outside of viewing and

accessing information that Health Compass directly provided. *Id.* at ¶ 42. Health Compass does not have access to Ark's vendor agreements nor Ark's pricing structures with the vendors. *Id.* at ¶ 43.

Upon information and belief, Mr. Mohapatra, however, agreed to work directly with Health Compass. *Id.* at 44. Mr. Mohapatra does have access to Ark's pricing structures, client-organizations list, and other Ark Confidential Information, through the management of the Modified Platform. *Id.* at ¶ 45.

Effective January 1, 2025, Health Compass stopped paying Ark for Ark's services to Health Compass and its members. *Id.* at ¶ 46. On or about March 31, 2025, as a result of Health Compass's refusal to pay Ark for its services, Ark terminated Health Compass's access to its systems. *Id.* at ¶ 47. Upon information and belief, during that time, Vasquez began providing services to Health Compass and collecting payment for those services. *Id.* at ¶ 48. After Ark turned off Ark's services for Health Compass, Vasquez improperly turned Health Compass' access to Ark's services back on. *Id.* at ¶ 49.

Vasquez has no direct relationship with Ark's vendors and no ability to provide Health Compass with Ark's services. Vasquez is a software programming company, not a third-party administrator of employer health and welfare benefit plans like Ark. Yet, Vasquez did so by using Ark's confidential and proprietary

12

data, and by using the Modified Platform to service Health Compass directly -- all to Ark's detriment. *Id*. at ¶ 50.

Ark's vendors have expressed confusion as to whether Health Compass members should be provided the services covered by their contracts with Ark. *Id*. at ¶ 51. And, Ark's vendors would be within their contractual rights to bill Ark for services provided to Health Compass members and, upon information and belief, intend to do so. *Id*. at ¶ 52.

Vasquez, after improperly giving Health Compass's access to Ark's services and confidential and proprietary information after March 31, 2025, also emailed Ark, Ark's vendors, and Health Compass's members, announcing that a new third party administrator would be performing healthcare benefit services soon. A true and correct copy of this correspondence is attached hereto as **Exhibit D**. Upon information and belief, Vasquez has been paid by Health Compass approximately $100,000.00 per month to perform services provided by Ark and using the Modified Platform. *Id*. at 54. Apparently, Vasquez is using Ark's Client Work Product and/or Intellectual Property Rights to serve Health Compass. *Id*. at 55.

In addition to improperly exploiting Ark's Confidential Information, Client Work Product, and/or Intellectual Property Rights, Vasquez is threatening to cause irreparable harm by disrupting service to Ark's other client-organizations and their 28,000 members. *Id*. at ¶ 56. Specifically, on April 24, 2025, Vasquez sent Ark an

13

email (along with an invoice dated April 23, 2025) suggesting that Vasquez had elected to unilaterally terminate the Services Agreement. *Id*. at ¶ 57. A true and correct copy of this correspondence is attached hereto as **Exhibit E.**

There is no lawful basis for this threat. As set forth above, Section 11.2 of the Services Agreement permits an early termination only if there has been notice of a material breach and the breaching party has been given thirty (30) business days to cure. See Services Agreement, at Section 11.2. There has been no material breach here by Ark. *See* Compl. at ¶ 60. Nor has Ark been given formal notice of any such default – much less a 30-day opportunity to cure. *Id*. at ¶¶ 61-62.

The invoice Vasquez sent to Ark on April 24, 2025, was the first invoice Ark was sent during the first two years the parties were operating under the Services Agreement. *Id*. at 64. Since the execution of the Services Agreement, Ark has sent Vasquez numerous payments in excess of the minimum monthly amount called for by the Services Agreement, which Ark calculated based on the services performed by Vasquez. *Id*. at ¶ 65. Vasquez accepted such payments, and never communicated such payments were of an incorrect amount or at an incorrect time. *Id*. at ¶ 66.

Upon information and belief, the April 23, 2025, invoice from Vasquez includes excessive and improper charges – including charges for Vasquez's improper processing of data for Health Compass. *Id*. at ¶ 67.

As outlined above, Vasquez previously called, and is currently calling, Ark's vendors who provide services for Arks' client-organizations (including Health Compass) to (a) spread misinformation about Ark, and (b) attempt to contract directly with the vendors and cut out Ark from providing the services. *Id*. at ¶ 68. On April 28, 2025, Ark, via counsel, sent a letter to Vasquez to address the concerns detailed above. In particular, Ark demanded that Vasquez: (a) cease and desist from utilizing Ark's Confidential Information; and (b) confirm that it will not unilaterally (and improperly) disable Ark's access to the Modified Platform. A true and correct copy of this correspondence is attached hereto as **Exhibit F.**

To date, Vasquez has failed to provide reasonable assurances in response to Ark's requests. *See* Compl. at ¶ 70. As Vasquez acknowledges in the Services Agreement, if Ark's use of the Modified Platform is suspended, this would harm Ark, Ark's client-organizations and their 28,000 members, and Ark's relationships with its vendors. *See* Services Agreement, at Section 1.8.

### III.    ARGUMENT AND CITATION TO AUTHORITY

**A.    Legal Standard**

The purpose of a preliminary injunction is to preserve the status quo when the balance of equities so heavily favors the movant that justice requires the court to intervene pending judgment. *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 572

24864439.2

(5th Cir. 1974)[2]; *see Robinson v. Attorney Gen.*, 957 F.3d 1171, 1178 (11th Cir. 2020); *Northeastern Fla. Ch. of Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990) (hereinafter, "*Jacksonville*"). A preliminary injunction is proper where the movant can show: (1) a substantial likelihood of ultimate success on the merits; (2) irreparable harm will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs the harm the injunction would inflict on the opposing party; and (4) the injunction would not be adverse to the public interest. *Lepper v. Franks*, No. 5:18-cv-644-Oc-41PRL, 2019 WL 175276, at *1 (M.D. Fla. Jan. 11, 2019) (hereinafter, "*Lepper II*") (citation omitted). The standard for obtaining a temporary restraining order is identical to that for obtaining a preliminary injunction. *See Chef Merito, Inc. v. Gonzalez*, No. 1:20-CV-1242-AT, 2020 WL 5548339, at *1 (N.D. Ga. Aug. 19, 2020) (citing *Windsor v. U.S.*, 379 F. App'x 912, 916–17 (11th Cir. 2010)).

Ark meets all four requirements with respect to its request to enjoin Vasquez from: (1) shutting off Ark, its customer-organizations and their members, and Ark's vendors to the Modified Platform; (2) continuing to misappropriate and use Ark's Confidential Information, Client Work Product, and Intellectual Property; and (3)

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), the Eleventh Circuit adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

otherwise further breaching the Services Agreement and other legal obligations to Ark.

**B.    Ark is entitled to a preliminary injunction preventing Defendant from unilaterally terminating the Services Agreement.**

*1.    Ark has shown a likelihood of success on the merits.*

Ark asserts a claim for breach of contract stemming from Vasquez's improper threats to interrupt service. *See* Compl. at ¶¶ 73-90. Ark is likely to prevail on the merit of this claim. Under Georgia law, which governs the Services Agreement, "[t]he elements for a breach of contract claim … are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." *SAWS at Seven Hills, LLC v. Forestar Realty, Inc.*, 342 Ga. App. 780, 784, 805 S.E.2d 270, 274 (2017) (internal quotation marks omitted).

Ark meets these elements. First, there is no lawful basis under the Services Agreement for Vasquez's current threat to interrupt service. Vasquez claims Ark failed to timely pay its April 23, 2025 invoice.  But even if failure to pay an invoice constituted a material breach, under the Services Agreement Ark would have thirty (30) business days to cure after written demand.  *See* Services Agreement, §11.2.  In no event could Vasquez terminate the Services Agreement before the expiration of these 30 business days.  But that is what Defendant threatens here.

Moreover, the April 23, 2025 invoice is overinflated and disputed because it includes service charges for Health Compass' members despite Health Compass

24864439.2

being terminated effective January 1, 2025. Although Ark terminated Health Compass' access and use of the data in the Modified Platform, Vasquez thereafter restored Health Compass's access to the Modified Platform. Vasquez was not authorized to do so. Regardless, Vasquez's charges for managing the Health Compass data during 2025 are not authorized. Vasquez cannot rely on non-payment of its April 23, 2025 invoice, or non-payment of any processing fees related to Health Compass' data during 2025, as a basis for early termination.

Second, the potential harm posed by Defendant's threat is enormous. Ark's inability to access and use the Modified Platform (and the confidential and proprietary data and information maintained therein) would hamstring Ark's ability to provide automated TPA services to its client-organizations and their members. This would result in thousands of individuals being suddenly left without Ark's TPA services until a suitable replacement database could be located.

Third, Ark is plainly the party with the "right to complain about the contract being broken." *SAWS*, 342 Ga. App. at 784. As explained above, in no event may Vasquez terminate with less than 30 business days' notice. Thus, Ark has a likelihood of success on its breach of contract claim.

2.    *Ark faces irreparable harm in the absence of injunctive relief.*

Absent an injunction preventing Defendant from terminating the Services Agreement, Ark will face irreparable harm. So too will its customers, who are

suddenly left without service.  This harm is clear, imminent, and of the kind that cannot be remedied by monetary relief or other later "compensatory or other corrective relief." *Sampson v. Murray*, 415 U.S. 61, 90 (1974); *see Jacksonville*, 896 F.2d at 1285; *Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991) (noting that loss of customers and goodwill is "irreparable" injury). That is precisely the case here.

Courts in this Circuit have found a risk of irreparable injury in this situation that warrants both a temporary restraining order and a preliminary injunction. *See, e,g¡, Lepper II,* 2019 WL 175276, at *2 (finding risk of irreparable injury and granting preliminary injunction where the plaintiff asserted the defendants shut down sim cards that rendered medical alert devices inoperable and effectively shut down the plaintiff's business); also *Lepper v. Thomas Clayton Franks*, No, 5:18-cv-644-Oc-41PRL, 2018 WL 8221521, at. *2 (M.D. Fla, Dec, 28, 2018) (granting a temporary restraining order under the same facts) (hereinafter, "Lepper I"). *Lepper* involved a dispute between co-owners of a company that provided "safety and security alert services to senior citizens." *Lepper I*, 2018 WL 8221521 at *1.

When the dispute between the owners emerged, the defendants served notice on plaintiff that the sim cards for medical alert devices would be deactivated. *Id*. The plaintiff sought an immediate temporary restraining order and preliminary injunction to stop this deactivation, claiming his clients would be irreparably

19

injured if "[d]efendants shut down the sim cards, which would render the medical alert devices inoperable." *Id*. at *1-2.

The court held that the threat of the defendants "turning off" the potentially life-saving medical alert devices constituted an irreparable harm. *Lepper II*, 2019 WL 175276, at *2. The court reasoned (as Ark alleges here) that there was no adequate remedy at law for the consequences entailed in the possible discontinuation of access to health-related services. *Id.*; *see also Cyber Promotions, Inc. v. Apex Global Information Servs., Inc*., No, Civ.A 97-5931, 1997 WL 634384, at *1-4 (ED. Pa. Sept. 30, 1997) (requiring Internet provider to continue providing service until replacement provider in place).

Here, a similar situation is present. Irreparable harm is threatened if Vasquez is not required to continue providing the services called for by the Services Agreement until new provider is in place. *Id.*; *see also Resident Advisory Bd. V. Rizzo*, 503 F. Supp, 3833, 389 (E.D. Pa. 1980) ("Any activity that may threaten human life may be enjoined on the ground that a court of equity will not gamble with human life, at whatever odds, and on the ground that for loss of life there is no remedy that is, in an equitable sense, adequate").

While the life-safety concerns alone should satisfy this prong, it also bears note that allowing Vasquez to discontinue the systems it is currently maintaining would be devastating to Ark's business and goodwill. The risk of such loss is an

20

additional basis for injunctive relief. *See, e.g., Ferrero*, 923 F.2d at 1449 (loss of customers and goodwill is "irreparable" injury).

To be clear: Ark has already suffered damage to its goodwill based on the recent confusion Vasquez has caused. But cutting off service to Ark's customers for an extended period would make things exponentially worse. In addition to the life-safety concerns, an injunction is also necessary to protect Ark's goodwill from further harm. *See Cyber Promotions,* 1997 WL 634384, at *3.

> 3.    *The threatened harm to Ark outweighs the potential harm to Defendant.*

The balance of harms tilts heavily in favor of the entry of injunctive relief. All Defendant needs to do is continue providing the services it agreed to provide, which poses little to no risk to Defendant. On the other hand, as shown above, absent an injunction, the threatened harm to Ark is significant and greatly outweighs the potential harm to Defendant.

> 4. *A preliminary injunction would serve the public interest.*

Issuing the preliminary injunction will serve the public interest by maintaining the status quo in light of Vasquez's threats to terminate the Services Agreement and deny Ark, Ark's vendors, Ark's client-organizations and thousands of members access to the Modified Platform. If this were allowed, Ark's client-organizations and over 28,00 individuals could lose access to insurance and non-insurance resources

21

they are entitled to. The Services Agreement is an enforceable contract. Temporary injunctive relief should be granted to prevent Vasquez from breaching that contract.

**B.    Ark is entitled to a preliminary injunction preventing Defendant from Exploiting Ark's Confidential Information and Client Work Product.**

Additionally, Defendant should be enjoined from its continued unauthorized use of Ark's Confidential Information and Client Work Product.

1.    *Ark has shown a likelihood of success on the merits*

Ark is likely to succeed on its claims stemming from Vasquez's continued and improper use of Ark's Confidential Information and Client Work Product.

**(a)    Breach of Contract**

Vasquez is prohibited from using or disclosing Ark's Confidential Information except as expressly permitted by Ark and for no other purpose. *See* Services Agreement at § 3.   Vasquez's continued use of Ark's Confidential Information and Work Product violates the Services Agreement.

**(b)    Uniform Deceptive Trade Practices Act**

Ark is also likely to prevail on its claim under the Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-372 *et seq*., which provides separate and independently sufficient grounds to enjoin Defendants from its continued use of Ark's Confidential Information and Client Work Product. O.C.G.A. § 10-1-372 defines a "deceptive trade practice" as one that:

24864439.2

(2) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3) Causes likelihood of confusion or misunderstanding as to affiliation, connection, or association with or certification of another; …

(8) Disparages the goods, services, or business of another by false or misleading representation of fact; … or

(12) Engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

*See* O.C.G.A. § 10-1-372(a). Injunctive relief is available to a party "likely to be damaged by a deceptive trade practice of another[.]" *See* O.C.G.A. § 10-373(a). "Proof of monetary damage, loss of profits, or intent to deceive is not required." *Id*.

Here, as shown in **Exhibits C** and **D**, Ark has (at the very least) shown the disparagement of Ark's services, and also potential confusion caused by Vasquez's attempts to provide direct service to Ark's customers while using the Modified Platform and Ark's Confidential Information.

### (c)     Georgia Trade Secrets Act

Finally, Ark is likely to prevail on its claim under the Georgia Trade Secrets Act (the "GTSA"). Under the GTSA, O.C.G.A. § 10-1-760, et seq., a "trade secret" is defined as:

information, without regard to form, including, but not limited to ... **a list of actual or potential customers** or suppliers which is not

24864439.2

commonly known by or available to the public and which information:

(A) Derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

O.C.G.A. § 10-1-761(4)(emphasis added).  *See also Leo Publications, Inc. v. Reid*, 265 Ga. 561, 458 S.E.2d 651 (1995)(customer lists and vendor lists "warrant protection as trade secrets"). Furthermore, "[a]ctual or threatened misappropriation [of a trade secret] may be enjoined." *See* O.C.G.A. § 10-1-762; *see also Wright v. Power Industry Consultants, Inc.*, 234 Ga. App. 833, 508 S.E.2d 191 (1998)(GTSA authorizes injunctive relief to protect trade secrets, including customer lists).

In this case, Ark has a substantial investment in its customer contracts (which is even more sensitive than a standalone customer list) and it has undertaken reasonable efforts to preserve its confidentiality.  *See* Compl., ¶¶ 26-29.

2.    *Ark faces irreparable harm in the absence of injunctive relief.*

It is well-settled that the improper or threatened use or disclosure of a party's confidential and proprietary information causes irreparable harm. *G.W. Henssler & Assocs., Ltd. v. Marietta Wealth Mgmt., LLC*, No. 1:17- CV-2188-TCB, 2017 WL 6996372, at *6 (N.D. Ga. Oct. 23, 2017) ("Loss of confidential and proprietary information is per se irreparable harm."); *Priority Payment Sys., LLC v. SignaPay,*

24864439.2

*Ltd.*, 161 F. Supp. 3d 1294, 1303 (N.D. Ga. 2016) (threatened use of trade secret information justified entry of injunction). Further, irreparable harm can also be shown through loss of business opportunities, loss of customer relationships and goodwill, diversion of a company's customers, and loss of employees. *Heartland Payment Sys., LLC v. Stockwell*, 446 F.Supp.3d 1275, 1285-86 (N.D. Ga. 2020); *Kennedy v. Shave Barber Co., LLC*, 348 Ga. App. 298 (2018).

The same is true with respect to Ark's claim under the GTSA. "Georgia's trade secret law prohibits unauthorized use of trade secrets. Where, as here, the harm concerns misappropriation of trade secrets, an injunction should issue to prevent such harm." *The Coca Cola Company v. Reed Industries, Inc.*, 1988 U.S. Dist. LEXIS 16551, *23 (N.D. Ga. 1988)(citation omitted).

3. *The threatened harm to Ark outweighs the potential harm to Defendant.*

The risk to Plaintiff of not granting the interlocutory injunction is great. Unless restrained and enjoined, Vasquez will continue to violate the Services Agreement -- and unlawfully exploit Ark's Confidential Information.

On the other hand, the grant of an interlocutory injunction will simply require Vasquez to comply with its contractual obligations. Vasquez will still be allowed to run its business and use its base platform. It will just have to do so without competing illegally against Ark and without improperly using Ark's confidential information. Any potential harm to Vasquez would result only from

24864439.2

enforcing contract restrictions it agreed to honor. *See Heartland Payment Sys., LLC,* 446 F. Supp. 3d at 1286 (N.D. Ga. 2020) (injunction was proper where "any potential harm [to defendant] 'is the result of enforcement of covenant not to compete to which [she] agreed' and is outweighed by the potential harm to [employer] if the injunction not entered"). As a result, the threatened injury to Ark if an injunction is not granted greatly outweighs whatever damage Vasquez may face based on the proposed injunction. *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005).

Thus, the balance of harms favors entering the injunction. *Cunningham Lindsey U.S. LLC*, 2018 WL 10560768 at *6 (recognizing no harm to defendant who was merely required to comply with contractual non-solicit obligations to which he already agreed); *Priority Payment Sys., LLC*, 161 F. Supp. 3d at 1303-04 (threatened injury to plaintiff from loss of its confidential information, lost revenue, and lost value of its information outweighed whatever harm resulted to defendants); *Heartland Payment Sys., LLC*, 446 F.Supp.3d at 1286 (restrictions on defendant's ability to work were justified by threatened injury to be prevented by injunction); *Kennedy*, 822 S.E.2d at 614 (recognizing the significant harm caused by entry of the injunction against defendant but finding the threatened injury to plaintiff's customer relationships outweighed the harm to the defendant).

The same is true under the GTSA. *See Coca Cola*, 1988 U.S. Dist. LEXIS

26

16551 at *25 (concluding that balance of hardship "clearly favors" trade secret owner where defendant engaged in willful misappropriation). Because Vasquez should not be unlawfully exploiting Ark's trade secrets in the first place, it cannot claim any harm from not being allowed to continue to do so in the future.

   *4.  A preliminary injunction would serve the public interest.*

   Protecting confidential information and trade secrets trade serves the public interest. *Priority Payment Sys., LLC*, 161 F. Supp. 3d at 1303-04 (detailing the importance to the public interest of protecting trade secrets from misappropriation). Georgia public policy also favors the enforcement of restrictive covenants. *Cunningham Lindsey U.S. LLC*, 2018 WL 10560768 at *6 (enforcement of restrictive covenants serves the public interest). When a party is duty bound to safeguard the proprietary information of another, "public policy is swung in favor of protecting these commercial intangibles and of preventing unfair methods of exploiting them in breach of duty." *Lee v. Envtl. Pest & Termite Control*, 271 Ga. 371, 516 S.E.2d 76, 77 (1999). It does not offend public policy to require Defendant to cease its improper exploitation of Ark's trade secrets.

   To the contrary, Ark's requested injunction serves the public's interest in creating a stable environment for commerce, protecting trade secrets, and enforcing restrictions governing the use of confidential information and trade secrets.

27

IV.    **CONCLUSION**

For the foregoing reasons, the Court should grant Plaintiff's Motion.

Respectfully submitted this 9th day of May, 2025.

*/s/**Brooke W. Gram***
Brooke W. Gram
bgram@balch.com
Georgia Bar No. 810901
Matthew B. Ames
mames@balch.com
Georgia Bar No. 015898
**BALCH & BINGHAM LLP**
30 Ivan Allen Jr. Blvd. N.W.,
Suite 700
Atlanta, GA 30308
Telephone: (404) 261-6020
Facsimile: (404) 261-3656

*Attorneys Plaintiff the Ark Group*
